# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

HOUSTON CASUALTY COMPANY,

    Plaintiff,

v.    Civil Action No.01:09-cv-1387

SPRINT NEXTEL CORPORATION,

    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff Houston Casualty Company's ("HCC") Motion for Summary Judgment and Defendant Sprint Nextel Corporation's Motion for Summary Judgment ("Sprint"). For the reasons stated herein, Plaintiff's Motion for Summary Judgment is denied and Defendant's Motion for Summary Judgment is granted.

In 1998, Sprint's shareholders approved a reclassification of then-existing common stock to create two separate stocks that tracked Sprint's traditional wireline service ("FON") and its wireless business ("PCS"). At that time, Sprint shareholders gave the company's board of directors full authority, at any time after 2002, to recombine the tracking stocks in a manner that was fair to both classes of shareholders.

In February 2004, the board unanimously voted to recombine the FON and PCS tracking stocks, with each share of PCS stock

being converted into one-half share of FON stock. On February 29, 2004, Sprint notified its shareholders that, effective April 23, 2004, the tracking stocks would be recombined by the issuance of additional FON shares to PCS shareholders, thereby leaving FON stock as the sole surviving equity ownership instrument.

As a result, in early March 2004, certain Sprint shareholders filed various class action lawsuits against Sprint and fourteen of its directors and officers ("D&O") in Kansas state court. Collectively known as the Garco litigation, the Garco plaintiffs filed a Consolidated Amended Class Action Petition. They claimed that Sprint's directors "breached their . . . fiduciary duties in setting the Conversion Ratio," which they alleged "greatly under-valued PCS shares." They sought "money damages to compensate them for the loss of value to their PCS shares."

At the time, Sprint maintained a D&O insurance program providing $100 million in policy limits in several policy layers, with a $25 million deductible. The primary policy was issued by Zurich American Insurance Company ("Zurich") and provided $15 million in coverage. American Casualty Company ("CAN") and HCC issued policies in sequential excess layers, each providing $15 million of coverage. The CAN and HCC policies

2

"follow form" and thus generally incorporate by reference the terms of the 2003-04 Zurich policy.

The Zurich policy covered, among other things, "all Loss" that "Insured Persons" (i.e., the D&Os) became "legally obligated to pay on account of any Claim first made against them . . . during the Policy Period . . . for a Wrongful Act." The term "Loss" is broadly defined as the "total amount" that insureds "become legally obligated to pay . . . , including, but not limited to, damages, judgments, settlements, and Defense Costs." The definition of "Loss" contains a further sentence expressly carving out, among other things, "matters uninsurable under the law pursuant to which this policy is construed"—in this case, Kansas law.

Other policy provisions pertinent to this case include the Zurich policy's condition that insurer "advance[s] of Defense Costs shall be repaid . . . to the extent it is determined that such Defense Costs are not insured by this policy." By contrast, none of the policies contains a provision permitting insurers to seek repayment of settlement advances. The HCC, CAN, and Zurich policies all vest the insurers with the right to participate in the defense of covered claims and provide that Sprint shall not settle a claim absent insurer consent. Finally, the policies provide that their terms will not be "changed or modified other than by written policy endorsement."

3

In March 2004, Sprint provided notice of the Garco litigation to HCC and the other insurers in its 2003-04 D&O insurance program. In September 2004, Zurich's coverage counsel sent Sprint a letter reserving its rights. The letter, however, did not assert that the Garco claims might be "uninsurable." Over a year later, Zurich supplemented its initial letter and asserted for the first time that part of the Garco claim might be "uninsurable under the law." In September 2006, CNA wrote to Sprint, incorporated by reference the two Zurich letters. HCC subsequently incorporated by reference the CNA letter.

In late January 2007, Sprint advised HCC and the other carriers that it wished to engage in settlement negotiations in the Garco case. Coverage counsel for Sprint, Zurich, and CAN—but not HCC—exchanged letters regarding the parties' coverage positions. Indeed, between January 5 and July 26, 2007, HCC provided no response to Sprint's various letters. By February 2007, however, HCC internally classified Garco as a "high-severity" claim, recognized that Sprint would "vigorously contest" any no-coverage position, and even said that the likely resolution of the coverage issue was "unclear." By May 2007, HCC had a $15 million reserve and "contemplated coverage litigation," while acknowledging it would face "substantial risk" in such litigation.

Meanwhile, in March 2007, the trial court in Garco had granted the plaintiffs' motion for a jury trial, indicating that this was a "damages case." By mid-May 2007, the Garco parties agreed to participate in mediation along with its insurers. After the first two sessions ended in stalemate, retired Judge Nicholas Politan, the mediator, concluded the third session with a "mediator's proposal" that the Garco action settle for $57.5 million. The Garco defendants indicated that they would accept this proposal subject to the insurers consenting to the settlement and agreeing to fund all but the $10 million balance remaining on the deductible. The Garco plaintiffs indicated that their commitment to the mediator's proposal was valid for one week.

The next day, Sprint's counsel wrote to the insurers, including HCC, requesting that by mid-day on July 25, 2007, they confirm their consent to the $57.5 million settlement and agree to provide funding subject to their policy limits. HCC then requested and received an extension of that deadline. On July 26, 2007, HCC's claims handler received from HCC's outside counsel a draft litigation complaint concerning insurance coverage for the Garco action. Late that day, however, HCC sent Sprint a letter agreeing to pay its $15 million policy limit.

In its letter, HCC purported to "reserve[e] its right to deny coverage and to seek repayment of the Policy's limit of

liability." HCC's letter did not recite any contractual or other basis for its newly asserted right to seek repayment. The day after receiving HCC's funding commitment, Sprint acknowledged HCC's letter, but expressly noted that "Sprint reserves all rights and remedies," including in connection with any asserted right to seek repayment.

On September 5, 2007, the parties to the Garco action entered into their Settlement Agreement, a document that HCC reviewed and commented on in draft. That settlement, which disclaimed any suggestion of wrongdoing, included a broad release in favor of Sprint, its D&Os, and the funding insurers, including HCC, in exchange for a $57.5 million settlement payment. On October 1, 2007, HCC made its $15 million settlement funding payment directly into the escrow account maintained by counsel for the Garco plaintiffs. Zurich and CAN likewise each paid $15 million, while Sprint paid the $10 million remaining in the deductible and the fourth-layer insurer paid the balance. In advance of making its payment, HCC billed its insurers for their shares of the $15 million payment, and by November 1, 2007, HCC had received payments totaling $7,995,500 from them. On December 12, 2007, judgment was entered approving the Garco settlement.

Between July 26, 2007 and December 18, 2009, HCC failed to communicate with Sprint regarding any potential reimbursement claim. By the end of 2008, HCC had decided not to sue Sprint for

6

recoupment of its settlement contribution and closed its Garco claim files. Later, HCC learned of a recent opinion in Massachusetts federal court, Genzyme Corp. v. Fed. Ins. Co., 657 F. Supp. 2d 282 (D. Mass. 2009), rev'd in part and remanded, 2010 U.S. App. LEXIS 21079, Case No. 09-2485 (1st Cir. Oct. 13, 2010), and consequently reopened its claim file. On December 18, 2009, HCC filed its Complaint in this case.

This Court will grant a motion for summary judgment if "there is no genuine issue as to any material fact and [] the movant is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)(2)). There is no issue of material fact, and both parties have extensively briefed their positions. This case is ripe for summary judgment.

As this dispute arises from the insurance contract, this Court must first examine the language of the agreement between Sprint and HCC. No party disputes that Kansas law applies to this action. Under Kansas's law of insurance contracts, this Court must "consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter and the purpose to be accomplished. Policies must be construed according to the sense and meaning of the terms used, and if the language is clear and unambiguous, it

must be taken in its plain, ordinary and popular sense." Bramlett v. State Farm Mut. Auto. Ins. Co., 468 P.2d 157, 159 (Kan. 1970) (citing Continental Casualty Co. v. Employers Mut. Casualty Co., 422 P.2d 560 (Kan. 1967); Saul v. Saint Paul-Mercury Indemnity Co., 250 P.2d 819 (Kan. 1952)).

Both parties agree that the HCC policy follows form and thus generally incorporates by reference the terms of the Zurich Policy. It is therein that "loss" under the terms of the HCC policy is defined:

> **Loss** means the total amount which the **Insured Persons** become legally obligated to pay on account of each **Claim** and for all Claims in each **Policy Period** and the Extended Reporting Period, if exercised, made against them for **Wrongful Acts** for which coverage applies, including, but not limited to, damages, judgments, settlements and **Defense Costs**.

Jt.Ex. 3 (emphasis in original).

Sprint contends the "loss" issue is straightforward. The text of the insurance contract makes clear that loss, as the definition is incorporated by the HCC contract, includes the total amount that insureds become legally obligated to pay, including through settlements. The settlement in Garco, upon which the court entered judgment, provides that "the Defendants shall pay or cause to be paid" $57.5 million. Thus, the amounts paid for the settlement of and subsequent judgment in Garco constitute loss under the terms of the Zurich and therefore the HCC policy.

HCC disagrees that the loss issue is so simple. HCC construes the settlement in Garco as a delayed payment of a preexisting corporate obligation, which, HCC argues, is not an insurable loss. HCC argues that the settlement it paid on Sprint's behalf cannot be considered a loss under the generally accepted meaning of that term. But under Kansas law, it is the definition within the contract that controls a term's interpretation. See Ochs v. Federated Mut. Ins. Co., 221 P.3d 622, 628 (Kan. App. 2010) ("insurance agreement['s] . . . terms, including definitions, will control so long as not in conflict with statutes or public policy"); Crescent Oil Co. v. Federated Mut. Ins. Co., 888 P.2d 869, 873 (Kan. App. 1995) ("It is the definition provided by the contract . . . that evidences the intention of the parties."); see also Gen. Accident Fire & Life Assur. Corp. v. Akzona, Inc., 622 F.3d 90, 93 (4th Cir. 1980) (policy's "definition provides 'the meaning which must be given to that term wherever it appears in the policy, unless the context clearly requires otherwise.").

HCC further argues that the settlement did not constitute a loss because the settlement merely redistributed assets among different classes of Sprint shareholders. Relying heavily on the now partially reversed and remanded decision of Genzyme Corp. v. Fed. Ins. Co., 657 F. Supp. 2d 282 (D. Mass. 2009), rev'd in part and remanded, 2010 U.S. App. LEXIS 21079, Case No. 09-2485

(1st Cir. Oct. 13, 2010), HCC asserts that because the company incurs no loss of assets due to the recalibration, there is nothing for an insurer to indemnify. Such an assertion ignores axiomatic corporate law: a corporation and its shareholders are distinct entities, Dole Food Co. v. Patrickson, 538 U.S. 468, 474 (2003), meaning that a corporation does not benefit by making a cash payment to a subset of its shareholders. Moreover, in a typical securities fraud suit, plaintiffs allege that one group of shareholders—i.e., those who purchased shares during a period when the share-price was artificially inflated due to the alleged misrepresentation—were harmed at the expense of another group of shareholders—i.e., those who sold shares during the same time period. See, e.g., Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005). The mere fact that a securities settlement results in a transfer from a corporation to a subset of its shareholders does not mean that the settlement fails to qualify as a "loss" to the corporation. If that were the case, as the First Circuit aptly noted, it would be "impossible to secure coverage for damages awards in routine securities litigation that charges the corporation with unfair or unlawful treatment of a class of securities holders." Genzyme Corp., 2010 U.S. App. LEXIS 21079, at *18-19.

Thus, for HCC to succeed in its argument, it must demonstrate that the loss is uninsurable as a matter of Kansas

public policy. HCC argues that Sprint should reimburse HCC for its payment of the Garco settlement because the payment violates two public policies: 1) insurance companies should not insure non-fortuitous events, and 2) insurance companies should not insure preexisting corporate obligations.

Because this Court's subject matter jurisdiction rests on its diversity jurisdiction, this Court must "rule upon state law as it exists and [should] not surmise or suggest its expansion." St. Paul Fire & Marine Ins. Co. v. Jacobson, 48 F.3d 778, 783 (4th Cir. 1995). Thus, this Court will "not create or expand [a] State's public policy," but instead will "ascertain and apply the law of State as it exists." Id. "Absent a clear and dominant articulation of [a] policy by the [state] herself, it would be improper for a federal court to deny insurance coverage on public policy grounds." See id. Kansas courts recognize that "the declaration of a public policy is primarily a legislative function." O'Bryan v. Columbia Ins. Group, 56 P.3d 789, 792 (Kan. 2002). For this reason, a purported public policy must "be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt" before it may be recognized by a court. Palmer v. Brown, 752 P.2d 685, 687-88 (Kan. 1988) (quoting Noel v. Menninger Foundation, 175 P.2d 751, 760 (Kan. 1954)). The impact of any public policy on a contract "must be measured by

Kansas policy as it existed when the insurance policy was issued." S. Am. Ins. v. Gabbert-Jones, Inc., 769 P.2d 1194, 1198 (Kan. App. 1989).

No Kansas authority supports HCC's assertion that the Garco settlement violates public policy. No Kansas statute prohibits insurance coverage for claims alleging that D&Os breached their fiduciary duties either generally or specifically in connection with the setting of an appropriate conversion ratio for the recombination of two tracking stocks. Regarding HCC's first ground for arguing that allowing Sprint to retain the settlement payment violates public policy, the circumstances surrounding the Garco settlement were far from fortuitous. When the policy was purchased on July 31, 2003, Sprint's board had not yet decided to recombine the tracking stocks, let alone set a recombination ratio. Moreover, when HCC issued the policy, it was obviously unknown that (i) the PCS shareholders would be or claim to be aggrieved, (ii) the PCS shareholders would make a claim and have it survive dispositive motions, and (iii) the defense and settlement costs would drive the claim into HCC's excess policy layer when the matter settled in 2007.

HCC's assertion that the Garco settlement violated public policy because it involved the satisfaction of an uninsurable preexisting corporate obligation is also unpersuasive. If breaches of fiduciary duties are uninsurable as preexisting

12

corporate obligations, D&O coverage would effectively be a nullity. Here, the policy's coverage grant broadly covers "wrongful acts," which include "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty" by the D&Os. Just as Sprint's board could be said to have had an obligation to set a fair recombination ratio, those same board members have numerous other preexisting obligations, such as refraining from making misstatements or misleading statements in SEC filings and complying with the company's charter and bylaws. It is no understatement to say that one of the principal reasons for D&O insurance is to cover D&Os when they are alleged to have breached such preexisting obligations. The mere existence of generalized obligations to follow the law and honor one's fiduciary duty does not render uninsurable a lawsuit alleging that corporate directors failed to do so.

The conduct of Sprint's other insurers further confirms there is no pervasive public policy against insuring matters like the Garco settlement. Zurich, CAN, and HCC all contributed their policy limits in 2007 to fund the Garco settlement; another excess insurer paid the portion of the loss that exceeded HCC's limits; and eight HCC reinsurers promptly reimbursed HCC for more than half of its contribution toward the Garco settlement. HCC itself paid the settlement in 2007 and

13

decided not to file a recoupment action against Sprint in 2008. Indeed, months before making its funding commitment, HCC admitted to its reinsurers that it was unclear which side would prevail on the coverage issue and that HCC would face substantial risk if we ended up in coverage litigation on this issue. HCC cannot now credibly argue that there was a well-established Kansas public policy rendering the Garco settlement uninsurable.

Indeed, HCC has acknowledged that it determined to reopen its claim file and sue Sprint in December 2009 only because of what it has called "a case of first impression" and "the first decision of its kind" by a Massachusetts trial court. Given HCC's acknowledgment that Genzyme was the first of its kind nationwide, it cannot at the same time assert that there was a "fixed" and "definite" public policy anywhere (much less in Kansas) that would have prohibited coverage for the Garco lawsuit when the policy was issued. See Palmer, 752 P.2d at 687-88 (quoting Noel, 267 P.2d at 941).

On the contrary, Kansas public policy favors enforcement of D&O insurance policies. In Kansas, the circumstances in which corporations may indemnify D&Os for liability arising out of litigation are limited by statute. See Kan. Stat. Ann. § 17-6305(a) & (b). Recognizing that the inability of a corporation to indemnify D&Os may deter board service, Kansas law fashions a

solution by providing that a "corporation shall have power to purchase and maintain insurance" on behalf of D&Os "whether or not the corporation would have the power to indemnify such person against such liability." Kan. Stat. Ann. § 17-6305(g). In other words, Kansas law expressly provides that even wrongdoing so severe as to be unindemnifiable by the corporation is nonetheless insurable under a D&O policy.

"Kansas courts have repeatedly recognized that the freedom to contract is an important public policy." St. Francis Reg'l Med. Ctr. v. Blue Cross Blue Shield of Kan., Inc., 810 F. Supp. 1209, 1218 (D. Kan. 1992). Moreover, the Kansas Supreme Court has held that "exceptions, limitations, and exclusions" in insurance policies must be narrowly construed. Marquis v. State Farm Fire & Cas. Co., 961 P.2d 1213, 1220 (Kan. 1998). Freedom of contract and the rule requiring exclusionary clauses to be narrowly construed thus foreclose HCC's effort to block coverage through the policy's uninsurability limitation.

Here, Sprint purchased insurance coverage for the "total amount" that it D&Os became "legally obligated to pay," including through "settlements." The unambiguous terms of this policy entitle Sprint to coverage for the $57.5 million settlement payment made to end the Garco litigation. Tellingly, D&O policy forms in widespread use at the time the HCC policy was issued contained language expressly excluding coverage for

15

claims involving "allegedly inadequate . . . consideration" for company stock. See, e.g., In re Delta Fin. Corp., No. 09-3557, 2010 WL 1784054, at *1 (3d Cir. May 5, 2010). This language, however, did not appear in the HCC and Zurich policies. From the face of the HCC and Zurich policies, and prevailing Kansas law, HCC was and is obligated to cover $15 million of Sprint's Garco settlement.

Despite the existence of a valid and enforceable insurance contract controlling this transaction, HCC seeks the extracontractual remedy of restitution in an effort to recoup its settlement payment. But "quantum meruit and restitution are not available theories of recovery" in circumstances where the parties are bound by a comprehensive written agreement. See, e.g., Fusion, Inc. v. Nebraska Aluminum Castings, Inc., 934 F. Supp. 1270, 1275 (D. Kan. 1996). HCC may not pursue a restitution remedy because there is no basis under the policies for an insurer to make a settlement advance and later seek its return. HCC and Sprint are bound by comprehensive written contracts that detail the parties' rights and obligations regarding defense and settlement of claims and go so far as to forbid one from inferring changes or modifications to the policies except through the formal amendment process. The Zurich policy directs that the insurer shall pay on behalf of the insureds both defense and settlement costs, yet grants the

insurer the right to seek a refund of an advancement of defenses costs only, not of settlement payments. Moreover, there has been no undertaking between the parties outside of the four corners of the policy by which they have agreed that HCC has a right to seek reimbursement.

When HCC unilaterally reserved its rights, Sprint immediately made a counter-reservation, and HCC has admitted that Sprint never agreed that HCC has a right to seek recoupment. Indeed, in this Circuit, where "[n]either the policy nor the endorsements contains any provision that gives [the insurer] a right to reimbursement for settlement payments," no action seeking recovery is allowed. Am. Modern Home Ins. Co. v. Reeds at Bayview Mobile Home Park, LLC, 176 Fed. Appx. 363, 367 (4th Cir. 2006) (unpublished). This Court will not allow HCC to retroactively amend its policy by trying to infer a recoupment right or attempt to circumvent the policy's terms by invoking restitution.

Indeed, Kansas law prevents this Court from doing so. Under Kansas law, a "party who, without mistake, fraud, or duress, voluntarily pays money on a demand which is not enforceable against him, cannot recover the amounts paid." Regency Park, LP v. City of Topeka, 981 P.2d 256, 260 (Kan. 1999) (quotation omitted). "[I]n the absence of fraud or duress payments which are voluntarily made with full knowledge of all the facts cannot

17

be recovered back by the person making such payment." MacGregor v. Millar, 203 P.2d 137, 139 (Kan. 1949) (citations omitted). Although HCC may have agreed to make its payment begrudgingly and pursuant to a unilateral reservation of rights, there can be no question that the payment was made voluntarily.

Even if HCC's payment was somehow involuntary or illegal, "[a]n unjust or illegal demand must be resisted at the threshold, because payment under protest may not be employed by way of strategy in dealing with an adversary." MacGregor, 203 P.2d at 140. For six months prior to making its funding commitment in July 2007, HCC knew it was confronted with a high severity claim, received the benefit of skilled outside counsel, and believed it had a basis to resist any payment demand by Sprint. Two months before making its funding commitment, HCC set a $15 million reserve, showing that it was fully prepared for a payment demand. When the payment demand came on the heels of the July 19, 2007 mediation, there was no surprise. That HCC purported to reserve its rights does not constitute involuntariness.

Kansas law does recognize a narrow exception to its no-recoupment rule in the case of fraud, duress, or mistake of fact. See MacGregor, 203 P.2d at 139. HCC, however, could not plead fraud, duress, or mistake of fact here: as stated in HCC's complaint, it *agreed* to pay its policy limits on July 26, 2007.

18

Even if Kansas were to recognize a recoupment cause of action, no such action would be permitted in the event of a multi-year delay. In Kansas, "[e]quity aids the vigilant and not those who slumber on their rights." Sec. Ben. Life Ins. Corp. v. Fleming Co., Inc., 908 P.2d 1315, 122 (Kan. App. 1995) (citation omitted); see also Farm Bureau Mut. Ins. Co. v. Progressive Direct Ins. Co., 190 P.3d 989, 994 (Kan. App. 2008). Here, HCC failed to sue before it made its funding payment on October 1, 2007. By the time the payment demand came on July 20, 2007, after the mediation sessions had concluded, HCC was certainly ready to file coverage litigation if it wanted to contest coverage. Indeed, on July 26, 2007—the date HCC made its funding commitment—HCC's coverage counsel provided HCC with a draft coverage complaint. As of July 26, 2007, HCC's plan was to sue for recoupment "at the earliest possible date" after making the funding payment. It is difficult to find any excuse for HCC's failure to sue before making its October 1, 2007 payment, let alone an excuse for its multi-year delay in suing after making its payment.

HCC fails to clear an additional hurdle of Kansas law in its attempt to recoup its settlement payment. Under Kansas law, a plaintiff must prove that it would be "inequitable" or "unconscionable" for the defendant to retain the benefit the plaintiff seeks to recover in a restitution action. Haz-Mat

19

Response, Inc. v. Certified Waste Servs. Ltd., 910 P.2d 839, 848 (Kan. 1996); Sec. Ben. Life Ins., 908 P.2d at 1323. Thus, HCC must, but cannot, show that it not only conferred a benefit on Sprint to which Sprint is not entitled, but that it is also "inequitable" or "unconscionable" for Sprint to retain that benefit. See Haz-Mat, 910 P.2d at 848. As previously discussed, the sanctity of contract, the voluntariness of HCC's payment, and HCC's unreasonable delay in seeking recoupment demonstrate that there is nothing inequitable about leaving HCC's $15 million payment undisturbed.

For the forgoing reasons, HCC's motion for summary judgment should be denied, and Sprint's motion for summary judgment should be granted.

An appropriate order shall issue.

/s/
Claude M. Hilton
United States District Judge

Alexandria, Virginia
November 22, 2010